**UNITED STATES of America Plaintiff,**

v.

**John SMITH Defendant.**

**No. 02–CR–163.**

United States District Court,
E.D. Wisconsin.

March 3, 2005.

Nilson Phillips, III, Milwaukee, WI, for Plaintiff.

Robert LeBell, Milwaukee, WI, for Defendant.

## SENTENCING MEMORANDUM

ADELMAN, District Judge.

The government charged defendant John Smith with possession with intent to distribute more than 50 grams of cocaine base. The charge arose out of an investigation into the origin of a fire at defendant's home, during which officers discovered crack and powder cocaine. Defendant pled guilty, and the probation office prepared a pre-sentence report ("PSR") which calculated defendant's offense level as 31 and his criminal history category as II, producing a guideline imprisonment range of 121–151 months. Under 21 U.S.C. § 841(b)(1)(A), a 10 year mandatory minimum sentence also applied.

Defendant objected to one guideline enhancement recommended by the PSR. In addition, the government moved for a downward departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) based on defendant's substantial assistance. In this memorandum, I discuss how I arrived at defendant's sentence. First, I set forth the sentencing methodology that I believe is appropriate after the Supreme Court's decision in *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

## I. POST-*BOOKER* SENTENCING METHODOLOGY

Following *Booker*, a court will typically follow a three-step sentencing process. First, the court must determine the applicable advisory guideline range. Ordinarily, this will require resolution of objections to the PSR's guideline calculations as well as any factual disputes.

Second, the court must determine whether, pursuant to the Sentencing Commission's policy statements, any departures from the advisory guideline range clearly apply. *See* U.S.S.G. ch. 5K. For example, in the present case the government moved for a substantial assistance departure under § 5K1.1.

Finally, the court must determine the appropriate sentence in light of the factors set forth in 18 U.S.C. § 3553(a). The court may impose a sentence within the applicable guideline range (after any clearly applicable departures) if such is consistent with the court's consideration of the § 3553(a) factors, or impose a non-guideline sentence if such is justified by the § 3553(a) factors. *See United States v. Crosby*, 397 F.3d 103, 112–13 (2d Cir.2005). A non-guideline sentence need not be supported by factors that would have justified a departure under the old, mandatory regime, *United States v. Ranum*, 353 F.Supp.2d 984, 986–87 (E.D.Wis.2005), and the court need not definitively resolve any departure issues if it has decided to impose a non-guideline sentence, *Crosby*, at 112. However, the court is free to rely upon departure case law in determining whether a guideline sentence is appropriate and in translating its findings into a numerical sentence. *See United States v. Galvez–Barrios*, 355 F.Supp.2d 958, 964 (E.D.Wis.2005).

## II. DISCUSSION

### A. Advisory Guideline Range

The PSR assigned a base offense level of 32 based on the weight of the drugs found in defendant's home. Officers discovered 69.99 grams of crack cocaine in a cooler and 653.19 grams of powder cocaine in a cell phone box. These amounts converted to 1528 kilograms of marijuana, U.S.S.G. § 2D1.1 cmt. n. 10, producing a level of 32, U.S.S.G. § 2D1.1(c)(4). Defendant did not quarrel with this calculation.

█ Officers also located two loaded handguns in a dresser, and pursuant to § 2D1.1(b)(1) the PSR assigned a two level

enhancement for possession of a dangerous weapon.[1] Defendant objected, arguing that the government did not prove a connection between the weapons and drug trafficking beyond a reasonable doubt. However, he did not deny possessing the guns.

I first noted that *Booker* did not change the government's burden of proving the applicability of enhancements under the now advisory guidelines. As the Seventh Circuit stated in *McReynolds v. United States*, 397 F.3d 479, 481 (7th Cir.2005): "The remedial portion of *Booker* held that decisions about sentencing factors will continue to be made by judges, on the preponderance of the evidence, an approach that comports with the sixth amendment so long as the guideline system has some flexibility in application." *See also Crosby*, at 112–14 (stating that, as before, judges are entitled to find all facts necessary to determining a guideline or non-guideline sentence).

Application note three to § 2D1.1, which addresses the enhancement for possession of a dangerous weapon, provides: "The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." U.S.S.G. § 2D1.1 cmt. n. 3. The Seventh Circuit has held that to establish the enhancement the government need only demonstrate, by a preponderance of the evidence, that the defendant possessed the weapon during the relevant period of drug activity. Once it has done so, the defendant must demonstrate that it was clearly improbable that the weapon was connected

---

1. The PSR also recommended a three level reduction under § 3E1.1, which neither party contested, resulting in a final level of 31.

to the offense. *United States v. Martin,* 287 F.3d 609, 617 (7th Cir.2002).

Courts have consistently held that guns found in the same house as drugs may justify the enhancement. *United States v. Garcia,* 925 F.2d 170, 173–74 (7th Cir.1991) (collecting cases). Defendant made no effort to show that the weapons were not connected to the offense. The PSR reported that defendant purchased the guns for protection. As the court noted in *Garcia,* it is likely that a loaded pistol, which is commonly possessed for protection, when found in the same location as controlled substances, is connected to drug activity. *Id.* at 174; *see also United States v. Coleman,* 149 F.3d 674, 678 (7th Cir.1998) ("Here, the district court correctly inferred that it was not clearly improbable that the fully loaded .38 caliber Taurus revolver found in his home—the same place where defendant was conducting his business—was connected to the drug offense."). Therefore, I concluded that the enhancement applied and overruled defendant's objection.

## B. Departures from Advisory Range [2]

[2] The government moved for a 6 level downward departure under U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e)[3] based on defendant's substantial assistance. In ruling on such a motion, a court considers the following factors:

(1) the significance and usefulness of the defendant's assistance, taking into consideration the government's evaluation of the assistance rendered;

(2) the truthfulness, completeness, and reliability of any information or testimony provided by the defendant;

(3) the nature and extent of the defendant's assistance;

(4) any injury suffered, or any danger or risk of injury to the defendant or his family resulting from his assistance; and

(5) the timeliness of the defendant's assistance.

U.S.S.G. § 5K1.1(a).

While the government's recommendation as to the extent of the departure is the starting point for the court's analysis, *United States v. Winters,* 117 F.3d 346, 349 (7th Cir.1997), the extent of any departure granted is within the court's discretion, *see United States v. Newman,* 148 F.3d 871, 875 n. 2 (7th Cir.1998). The departure must be "linked to the structure of the guidelines," but the Seventh Circuit has eschewed any rigid methodology. However, I have typically employed the method suggested in *United States v. Thomas,* 930 F.2d 526, 531 (7th Cir.1991), *overruled on other grounds by United States v. Canoy,* 38 F.3d 893, 906 (7th Cir.1994), and *Winters,* 117 F.3d at 349–50, awarding a two-level adjustment for each § 5K1.1 factor found to be fully present, *see. e.g., United States v. Washington,* 293 F.Supp.2d 930, 934 (E.D.Wis.2003).

### 1. Significance and Usefulness

Defendant zealously assisted the government, and his cooperation proved enormously useful, leading to multiple arrests and convictions. While undercover, he purchased firearms, and the purchase led

2. Defendant argued for a sentence below the guideline range based on post-offense rehabilitation, family circumstances, and the disparity between the guidelines' treatment of crack and powder cocaine. I concluded that I should address these arguments in determin-

ing whether to impose a guideline or nonguideline sentence at step three.

3. Section 3553(e) allows the court to depart below any applicable mandatory minimum on the government's motion.

to the government's seizure of multiple firearms and a rocket launcher, and to its conviction of the seller. Defendant's efforts led to another conviction when he persuaded an individual wanted for felony theft to turn herself in. Defendant provided information that enabled the government to obtain a search warrant, and as a result to discover cocaine, guns and cash, and to convict the owner of these items. Defendant wore a wire and purchased three cell phones from a telephone company aiding drug traffickers. He also discovered that the company was engaged in misappropriating personal information and so advised the government. Defendant provided information that led to the apprehension of a fugitive with multiple outstanding warrants. He also provided information that led to the arrest of one of Milwaukee's most wanted criminals, the purported leader of a gang known as the "Murder Mob." Defendant assisted the government in prosecuting a money laundering offense and would have testified in the case except that the defendant pleaded guilty on the second day of trial. Defendant provided information that enabled the government to obtain another search warrant, and the warrant led to the seizure of crack, marijuana and weapons, and to the arrest of their owner, who agreed to cooperate, leading to another conviction. Defendant provided information that led to the arrest of a second person with an outstanding felony warrant. While wearing a wire, he obtained admissions from a murder suspect to two shootings. He made six purchases of small amounts of contraband in connection with an FBI investigation involving sending proceeds of illegal activity overseas. He wore a wire during a conversation with a store owner involved in a WIC voucher scam. He also wore a wire and made contact with a drug suspect, who the government is now investigating. Finally, he provided information

concerning the possession and sale of counterfeit green cards, as well as several additional drug and money laundering operations.

In sum, defendant's cooperation was highly significant and useful, leading to multiple arrests, convictions and seizures of contraband. His assistance was as productive as that of any defendant I have seen. Thus, based on the significance of his cooperation, I reduced his offense level by three.

### 2. Truthfulness, Completeness and Reliability

The government vouched for defendant's truthfulness and stated that the information he provided was consistently reliable. Law enforcement relied upon him to obtain warrants and repeatedly used him in various different operations, displaying a high level of trust. Thus, I awarded defendant a two level reduction for this factor.

### 3. Nature and Extent

As discussed, defendant did far more than provide information to the government. He made controlled buys, repeatedly wore a wire and conducted surveillance. Thus, I awarded a two level reduction based on the nature and extent of his efforts.

### 4. Risk of Injury

By engaging in such high risk forms of cooperation as making controlled buys and wearing a wire, defendant exposed himself to serious risk of injury from many dangerous persons. Thus, this factor entitled him to a two level reduction.

### 5. Timeliness

The government indicated that defendant did not begin cooperating when he

was charged but did so upon being released from pre-trial detention. Because his cooperation was timely but not immediate, I awarded him a one level reduction for this factor.

Thus, I granted a total substantial assistance departure of 10 levels. With this departure, defendant's offense level became 21 and the advisory guideline imprisonment range 41–51 months. I next turned to the imposition of sentence under § 3553(a).

## C. Imposition of Sentence

■ Title 18 U.S.Code § 3553(a) now governs federal sentencing. It requires courts to consider seven factors:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed -

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner,

(3) the kinds of sentences available;

(4) the sentencing range established by the guidelines;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

After considering all of these factors, a court must "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph 2." *Galvez–Barrios,* at 959–60.

I typically group these factors into three general categories: the nature of the offense, the history and character of the defendant, and the needs of the public and any victims of the offense. I analyze each category and in so doing consider the specific statutory factors under § 3553(a). I then determine whether to impose a guideline or non-guideline sentence. *Ranum,* at 989–90.

### 1. Nature of Offense

As indicated, a fire investigator discovered the drugs after investigating the cause of a fire at defendant's house. Police found the guns in a dresser drawer pursuant to a subsequent consent search. Law enforcement had no prior knowledge that defendant was dealing drugs.

Although the offense was serious, no aggravating circumstances were present. Defendant did not appear to have ever committed or threatened violence or to have sold large quantifies of drugs. As noted, his guideline offense level was high because he possessed crack cocaine. Had he possessed only powder, his offense level (prior to the departure) would have dropped from 32 to 26, cutting the low end of his imprisonment range in half.

### 2. Character of Defendant

Defendant had a minimal prior record consisting of two convictions of possessing marijuana, for which he received short jail terms. I considered it significant that defendant had maintained a clean record since 2000 when the instant office occurred (the government did not charge him until

2002). I also considered defendant's extensive cooperation with the government indicative of positive character development. Further, defendant accepted responsibility for his crime and appeared both genuinely remorseful and cognizant of the effects of his actions on others.

Defendant had a stable employment history. Although he dropped out of high school, he subsequently obtained a cosmetology certificate from Milwaukee Area Technical College ("MATC") and worked as a barber for the better part of 10 years. Recently, he returned to MATC to obtain his high school degree.

Defendant has demonstrated a high level of responsibility in his personal and familial relationships. He has been in a stable relationship with Tenisha Adams for several years, and the two share 10 month old twins. Defendant lives with and supports his children. He also provides care and assistance for his mother, who has serious health problems including bladder cancer. After she underwent surgery, defendant lived with and cared for his mother, sleeping on the floor. He also demonstrated his commitment to his family when he came to the aid of his sister when she was attacked by an ex-boyfriend. The assailant struck defendant on the head with a shotgun seriously injuring defendant and requiring him to undergo brain surgery. Based on the above facts, I concluded that defendant's lengthy absence from the home would have a serious adverse impact on his family.

I also noted that since 2002, defendant has been an active member of the Freewill Community Baptist Church, and that his pastor submitted a positive letter on his behalf. Other persons also submitted letters attesting to defendant's good character.

In sum, the record contained much positive evidence about defendant's character and indicated that he had renounced criminal activity.

### 3. Needs of Public

For the reasons discussed, I did not believe that defendant posed a danger to the public or that he was likely to reoffend. Nevertheless, because of the seriousness of the offense, I believed that the sentence had to be sufficiently severe so as to promote respect for the law and provide just punishment.

### 4. Consideration of Guidelines

The sentence called for by the guidelines was driven largely by the weight of the drugs recovered from defendant's house. And, because defendant possessed crack cocaine, the sentence was greatly enhanced. As is now notorious, the guidelines create a 100 to 1 ratio between crack and powder cocaine. In other words, the guidelines treat possession of 50 grams of crack cocaine the same as they treat possession of 5000 grams (5 kilograms) of powder cocaine. *See* U.S.S.G. § 2D1.1(c)(4). Thus, in the present case, the 69.9 grams of crack that defendant possessed converted to 1399.80 kilograms of THC, while the 653.19 grams of powder converted to just 130.63 kilograms of THC.

Courts, commentators and the Sentencing Commission have long criticized this disparity, which lacks persuasive penological or scientific justification, and creates a racially disparate impact in federal sentencing. *See, e.g., United States v. Dumas*, 64 F.3d 1427, 1432 (9th Cir.1995) (Boochever, J., concurring); *United States v. Willis*, 967 F.2d 1220, 1226 (8th Cir. 1992) (Heaney, J., concurring); *United States v. Clary*, 846 F.Supp. 768 (E.D.Mo.), *rev'd*, 34 F.3d 709 (8th Cir.1994); *United States v. Patillo*, 817 F.Supp. 839 (C.D.Cal.

1993); David A. Sklansky, *Cocaine, Race, and Equal Protection*, 47 STAN. L. REV. 1283 (1995); Matthew F. Leitman, *A Proposed Standard of Equal Protection Review for Classifications Within the Criminal Justice System that Have a Racially Disparate Impact: A Case Study of the Federal Sentencing Guidelines' Classification Between Crack and Powder Cocaine*, 25 U. TOL. L. REV. 215 (1994); *The Debate on 2002 Federal Drug Guideline Amendments*, 14 FED. SEN. REPTR. 123, 188–242 (Nov./Dec.2001–Jan./Feb.2002); *Rethinking the Crack Cocaine Ratio*, 10 FED. SEN. REPTR. 179, 184–208 (Jan./Feb.1998).

The 100:1 ratio first appeared in the Anti–Drug Abuse Act of 1986, Pub.L. 99–570, 100 Stat. 3207 (1986), a law prompted in large part by the sudden death of basketball star Len Bias, purportedly from a crack overdose. *See* William Spade, Jr., *Beyond the 100:1 Ratio: Towards a Rational Cocaine Sentencing Policy*, 38 ARIZ. L. REV. 1233, 1249 (Winter 1996). In response to a perceived crack epidemic and in a climate that "some have characterized as frenzied," Congress dispensed with the normal deliberative process and hurriedly passed a bill.[4] *Id.* at 1250; *see also Clary*, 846 F.Supp. at 784–85 (discussing legislative history); *United States v. Walls*, 841 F.Supp. 24, 29–30 (D.D.C.1994), *aff'd in part, remanded in part*, 70 F.3d 1323 (D.C.Cir.1995) (same). The 1986 Act established severe mandatory minimum penalties for even first time offenders: 5 years in prison for those possessing 5 grams of crack (or 500 grams of powder), and 10 years for possessing 50 grams of crack (or 5 kilograms of powder). Subsequently, the guidelines incorporated the statutorily established disparity in penalties between crack and powder. *See* 21 U.S.C. § 841(b); U.S.S.G. § 2D1.1(c); Spade, *supra*, at 1249.

Because of its expedited passage, the Act left little legislative history. However, it appears that Congress associated crack with crime and violence, considered it more addictive than powder, and was concerned that its low cost and ease of manufacture would lead to more widespread use. *Id.* at 1252. Members of Congress stated that their goal was to target "serious" and "major" crack dealers. *Id.* at 1253. However, the legislative history, such as it is, contains no rationale for the 100:1 ratio; legislators suggested other ratios—50:1 and 20:1—but Congress rejected them. *Id.* at 1252, 1254. A former staff member of the House Judiciary Committee characterized the process as "the crassest political poker game," "I'll see your five years and I'll raise you five years." *Id.* at 1255.

The Commission has studied the issue in depth and concluded that the assumptions underlying the disparity between crack and powder are unsupported by data. First, while legislators may have intended to target serious drug traffickers, the Commission's data indicate that two-thirds of federal crack cocaine defendants are street level dealers. Diana Murphy, *Statement to Senate Judiciary Committee, May 22, 2002, reprinted in* 14 FED. SEN. RETPR. 236, 237 (Nov./Dec.2001–Jan./Feb.2002). Indeed, the 100:1 ratio actually targets low level dealers in a manner inconsistent with the intent of the 1986 Act. As one commentator estimated, at offense level 32 (defendant's initial level),

> dealers of drugs other than crack would have been dealing between $500,000 and $8 million worth of drugs, while crack

---

**4.** The fact that Bias probably snorted cocaine rather than smoked crack may have been lost in the frenzy. *Id.* at 1250–51.

defendants would have been dealing roughly $5750 worth of the drug.

Another way of illustrating the problem is that five grams of crack, which triggers a five-year mandatory minimum sentence, represents only 10–50 doses with an average retail price of $225—$750 for the total five grams. In contrast, a powder cocaine defendant must traffic in 500 grams of powder, representing 2500–5000 doses with an average retail price of $32,500—$50,000, in order to receive the same five-year sentence. The 500 grams of cocaine that can send one powder defendant to prison for five years can be distributed to eighty-nine street dealers who, if they converted it to crack, could make enough crack to trigger the five year mandatory minimum for each defendant. The result is that local-level crack dealers get average sentences quite similar to intrastate and interstate powder cocaine dealers; and both intra- and interstate crack dealers get average sentences that are longer than international powder cocaine dealers.

Spade, *supra*, at 1273 (internal footnote omitted).

Second, although legislators may have believed that crack was associated with other harmful conduct, Commission data indicate that "aggravating conduct occurs in only a small minority of crack cocaine offenses." Murphy, *supra*, at 238. "For example, an important basis for the establishment of the 100–to–1 drug quantity ratio was the understanding that crack cocaine trafficking was highly associated with violence. More recent data indicate that significantly less systemic violence

... is associated with crack cocaine trafficking than was reported earlier." *Id.* More importantly, the prevalence of aggravating factors in crack cases "does not differ substantially from the prevalence in powder cocaine offenses."[5] *Id.*

Third, the Commission concluded that pharmacological differences between crack and powder do not justify the disparity in penalties. "Cocaine is a powerful stimulant and in any form produces the same physiological and psychotropic effects." *Id.* at 239. Even the expert who testified before Congress before it adopted the 100:1 ratio acknowledged the absence of reliable evidence indicating that crack was more addictive or dangerous than powder. *Clary*, 846 F.Supp. at 791–92 (citing testimony of Dr. Robert Byck). Since then, other prominent experts have opined that crack is not more dangerous than powder—in fact, the converse may be true—and that crack is not physically more addictive, though it is possibly psychologically more addictive. *See United States v. Maske*, 840 F.Supp. 151, 155 (D.D.C.1993) (discussing testimony of Dr. George Schwartz); *see also Willis*, 967 F.2d at 1226 (Heaney, J., concurring) ("More recently, drug researchers have concluded that the short-term and long-term effects of crack and powder cocaine are identical"); *Walls*, 841 F.Supp. at 28 (citing testimony of Dr. Schwartz). The Commission's most recently obtained evidence confirms that the disparity in penalties is disproportionate to any reasonable assessment of crack's harmful effects. *See* U.S. SENTENCING COMMISSION HEARING, 2/25/02: *Cocaine Pharmacology, "Crack Babies," Violence, reprinted in* 14 FED. SEN. REPTR. 191, 193 (Nov./Dec.2001–Jan./Feb.2002)

---

**5.** The Commission has also collected evidence suggesting that any "spike" in violence in the mid–1980s was related to the "newness of the market" and has since leveled off. *See* U.S. SENTENCING COMMISSION HEARING, 2/25/02: *Co-*

*caine Pharmacology, "Crack Babies," Violence, reprinted in* 14 FED. SEN. REPTR. 191, 199 (Nov./Dec.2001–Jan./Feb.2002) (testimony of Dr. Alfred Blumstein).

(testimony of Dr. Glen Hanson of National Institute on Drug Abuse) (stating that the pharmacological effects of crack and powder cocaine are "very similar"); *see also* Murphy, *supra,* at 239. Finally, the evidence collected by the Commission shows that, in comparison to the mid–80s, the use of crack has decreased. U.S. SENTENCING COMMISSION HEARING, 2/25/02, *supra,* at 191 (testimony of Dr. Hanson).[6]

Thus, none of the previously offered reasons for the 100:1 ratio withstand scrutiny. Perhaps most troubling, however, is that the unjustifiably harsh crack penalties disproportionately impact on black defendants. Blacks comprise between 80% and 90% of federal crack cocaine defendants, compared to just 20% to 30% of powder cocaine offenders.[7] *See* Murphy, *supra,* at 239; U.S. SENTENCING COMMISSION HEARING, 2/25/02, *supra,* at 205 (testimony of Wade Henderson of the Leadership Council on Civil Rights); *see also Clary,* 846 F.Supp. at 786; *Walls,* 841 F.Supp. at 28; *Maske,* 840 F.Supp. at 154; *Patillo,* 817 F.Supp. at 843 n. 6. This is so despite the fact that statistics suggest that the majority of crack users are white. *See Clary,* 846 F.Supp. at 787 n. 68 (citing National Institute on Drug Abuse statistics).

Primarily as the result of the different penalties for crack and powder cocaine, and contrary to one of the Sentencing Reform Act's primary goals, the sentencing guidelines have led to increased disparity between the sentences of blacks and whites. Before the guidelines took effect, white federal defendants received an average sentence of 51 months and blacks an average of 55 months. After the guidelines took effect, the average sentence for whites dropped to 50 months, but the average sentence for blacks increased to 71 months. Spade, *supra,* at 1266–67 (citing 1993 U.S. Department of Justice, Bureau of Justice Statistics Report). Although there is no indication that the legislators intended that the law have a discriminatory effect,[8] as Commissioner Michael Gelacak noted, "If the impact of the law is discriminatory, the problem is no less real regardless of the intent." UNITED STATES SENTENCING COMMISSION, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Apr.1997), *reprinted in* 10 FED. SEN. REPTR. 184, 189 (Jan./Feb.1998).

Finally, the disparity in sentences involving crack and powder brings irrationality and possibly harmful mischief into the criminal justice system. All crack begins as powder, and transforming one into the other involves a quick and uncomplicated operation. Thus, guideline sentences vary widely based on facts that have little to do with culpability. For example, in *United States v. Shepherd,* 857 F.Supp. 105 (D.D.C.1994), *remanded by,* 102 F.3d 558 (D.C.Cir.1996), the defendant agreed to sell powder to an undercover officer. However, the officer, pursuant to his office "policy," insisted that the defendant cook the powder into crack. She did so in her microwave and thus raised her guideline

---

**6.** The Commission has also learned that the phenomena of "crack babies," another horrible discussed when Congress implemented the 100:1 ratio, is essentially a "myth." *See* U.S. SENTENCING COMMISSION HEARING, 2/25/02, *supra,* at 197 (testimony of Dr. Deborah Frank). Further, there is no evidence that crack is more harmful to unborn children than powder cocaine. *Id.* at 198 (testimony of Dr. Ira J. Chasnoff).

**7.** The Commission's data show that only 5% of crack defendants are white, compared to 30% of powder cocaine defendants. Murphy, *supra,* at 239.

**8.** *But cf. Clary,* 846 F.Supp. at 785–87 (suggesting that, based on media articles inserted into the congressional record, racism infused the process); *Walls,* 841 F.Supp. at 29 (noting statements that drug trafficking by blacks corrupted white users and communities).

range from 46–57 (with a 5 year mandatory minimum) to 108–135 months (with a 10 year mandatory minimum). *Id.* at 106–08. In its 1995 submission to Congress, the Commission reported a case in which two crack dealers, dissatisfied that the 255 grams of powder they had purchased converted to only 88 (rather than the usual 200) grams of crack, arranged to return the drugs to their supplier, who had agreed to replace the powder at no cost. However, before they returned the drugs, the crack dealers were arrested. At sentencing, their guideline range was 121–151 months, while the supplier's range was just 33–41 months. Spade, *supra*, at 1273.

To its great credit, the Commission has repeatedly sought to reduce the disparity. *See* UNITED STATES SENTENCING COMMISSION, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Criminal Justice System is Achieving the Goals of Sentencing Reform,* at 132 (2004); Diana Murphy, *Statement to Senate Judiciary Committee, May 22, 2002, reprinted in* 14 FED. SEN. RETPR. 236 (Nov./Dec.2001–Jan./Feb.2002); UNITED STATES SENTENCING COMMISSION, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (Apr.1997), *reprinted in* 10 FED. SEN. REPTR. 184, 189 (Jan./Feb.1998); UNITED STATES SENTENCING COMMISSION, *Special Report to Congress: Cocaine and Federal Sentencing Policy* (1995); *see also* U.S. SENTENCING COMMISSION HEARING, 3/10/02: *Cocaine Sentencing, reprinted in* 14 FED. SEN. REPTR. 217, 224 (Nov./Dec.2001–Jan./Feb.2002) (testimony of Judge Sim Lake on behalf of the U.S. Judicial Conference, in favor of "dramatically lowering the current 100 to 1 crack to powder cocaine ratio"). Unfortunately, the disparity remains, both in the context of mandatory

minimum sentences under 21 U.S.C. § 841(b) and under the guidelines. Only Congress can correct the statutory problem,[9] but after *Booker* district courts need no longer blindly adhere to the 100:1 guideline ratio.

In the present case, I concluded that adherence to the guidelines would result in a sentence greater than necessary and would also create unwarranted disparity between defendants convicted of possessing powder cocaine and defendants convicted of possessing crack cocaine. The question then became what ratio to apply. Everyone seems to agree that 100:1 is too high. Spade, *supra*, at 1284. Even the House sponsor of the bill that rejected the Commission's initial effort to eliminate the disparity stated that the Commission should close the gap though " 'not completely eliminate it.' " *Id.* at 1284–85 (quoting 141 Cong. Rec. H10,274 (daily ed. Oct. 18, 1995) (statement of Rep. McCollum)). At least some evidence suggests that crack is psychologically (if not physically) more addictive than powder (when inhaled),[10] and its lower cost per dose may also make crack dealing somewhat more harmful than trafficking in powder. *See Maske,* 840 F.Supp. at 157–57; *see also Patillo,* 817 F.Supp. at 843 n. 6 (citing *United States v. Harding,* 971 F.2d 410, 413 (9th Cir.1992)).

Most recently, the Commission recommended that the disparity be reduced but not eliminated. In its 2002 proposal, the Commission suggested that the threshold for the 5 and 10 year mandatory minimum penalties be increased from 5 and 50 grams to 25 and 250 grams, respectively. Murphy, *supra,* at 240. Because the Com-

---

**9.** In the present case, the government's § 3553(e) motion allowed a sentence below the mandatory minimum.

**10.** When powder cocaine is injected it may be more powerful and addictive than when smoked. *See* Spade, *supra,* at n. 19.

mission has studied this issue and acquired expertise, I gave its recent recommendation heavy weight. *See* 18 U.S.C. §§ 3553(a)(5) & (a)(6).

Although the Commission did not propose guideline amendments in 2002, its proposal for modifying the mandatory minimum thresholds, translated into guideline terms, would have resulted in a roughly 20:1 ratio. Using this conversion, defendant's drug weight would have been 410 kilograms of THC: [653.19 g of power $\times$ 200 g = 130,638 g THC] + [69.99 g of crack $\times$ (200 $\times$ 20 = 4000) = 279,960 g THC]. This calculation produced a base offense level of 28 rather than 32. With the § 5K1.1 departure and other adjustments, the offense level was 17 (28 + 2—3—10), creating a range of 27–33 months.

### 5. Sentence

Even after modifying the advisory guideline range based on the Commission's recommendations regarding crack cocaine, I believed the range to be somewhat greater than necessary because it did not take into account defendant's good conduct since he committed this offense over four years ago, his employment history and community involvement, and his importance to his family. I concluded that it would be appropriate to impose a non-guideline sentence to allow small reductions for these factors. *Cf. United States v. Manasrah,* 347 F.Supp.2d 634, 637 (E.D.Wis.2004) (granting two level departure based on defendant's family circumstances); *United States v. Smith,* 311 F.Supp.2d 801, 810 (E.D.Wis.2004) (granting two level departure for post-offense rehabilitation). Considering all of the § 3553(a) factors, I concluded that a sentence of 18 months was sufficient, but not greater than necessary to serve the purposes of sentencing.

## III. CONCLUSION

For the above reasons, I sentenced defendant to 18 months in prison, followed by 5 years of supervised release. Other conditions appear in the judgment.