**UNITED STATES of America**

v.

**Otis FISHER, Defendant.**

**No. S3 03 CR 1501 SAS.**

United States District Court,
S.D. New York.

Oct. 11, 2005.

David Jaffe, Laurie Korenbaum, Assistant United States Attorneys, New York City, for the Government.

Francisco E. Celedonio, New York City, for Defendant.

## *OPINION AND ORDER*

SCHEINDLIN, District Judge.

## I.  INTRODUCTION

In the eleven years that I have served as a district court judge, I have been troubled by the exceedingly harsh sentences imposed on those who deal in crack cocaine.[1] I find it unsettling, for example, that a defendant who deals five grams of crack cocaine faces the same sentence as a defendant who deals five *hundred* grams

---

1.  *See infra* Part III.A (average sentence for crack cocaine is ten years and three months; average sentence for powder cocaine is six years and nine months).

of powder cocaine. This stark disparity is commonly referred to as the "100:1 ratio." [2]

Congress adopted the 100:1 ratio in 1986, setting mandatory minimum sentences based on the quantity of cocaine, in crack or powder form.[3] The Sentencing Commission, following Congress' lead, adopted the same ratio in 1987, when it fashioned the Drug Quantity Table found at section 2D1.1(c) of the United States Sentencing Guidelines (the "Guidelines" or "U.S.S.G."). Under the Guidelines, the Drug Quantity Table determines a defendant's offense level, which ultimately controls the Guidelines sentence range.

After the Supreme Court's decision in *United States v. Booker,*[4] the statutory minimum sentences remain mandatory, but the Guidelines can no longer bind a sentencing court. Indeed, it would be unconstitutional under *Booker* for a court to treat the Guidelines as mandatory and conclude that it could not impose a sentence above or below the sentencing range determined primarily by the Drug Quantity Table.

In *United States v. Crosby,* the Second Circuit outlined sentencing procedures a court must follow after *Booker.*[5] First, the court must set the Guidelines range (including any departures)—here by applying the 100:1 ratio contained in the Drug Quantity Table. The court must then de-termine a reasonable sentence based on all of the factors listed in section 3553(a) of Title 18 of the United States Code ("section 3553(a)"). That section requires a court to impose a sentence that is "sufficient but not greater than necessary to comply with the purposes [of sentencing]."[6] To do this, a court must be free to impose a sentence above or below the range set by the Guidelines.

This Opinion addresses the tension between a mandatory minimum sentence and a non-Guidelines sentence, the former based solely on the notion that crack cocaine dealers should be punished much more severely than powder cocaine dealers as a function of relative drug quantity. In short, the sentencing disparity created by the 100:1 ratio presents two significant dilemmas. *First,* the ratio is binding for one purpose—imposing the mandatory minimum sentence—but is not binding for the purpose of imposing the ultimate sentence. *Second,* the Guidelines sentence, determined primarily by drug quantity, is often inconsistent with section 3553(a) because it is greater than necessary to achieve the goals of sentencing.

After a five-week jury trial, Otis Fisher was convicted of conspiracy to distribute crack cocaine (Count 1) and use of a firearm during a drug-trafficking offense (Count 2). On September 20, 2005, I sentenced Fisher to a non-Guidelines sentence

---

**2.** Congress adopted the 100:1 ratio in the Anti–Drug Abuse Act of 1986, Pub.L. No. 99–570, 100 Stat. 3207 (1986), when it created minimum and maximum terms of imprisonment for defendants convicted of trafficking in powder cocaine and crack cocaine.

**3.** Section 841(b)(1)(A) of Title 21 of the United States Code sets a mandatory minimum ten year sentence for those who possess or distribute more than *five kilograms* of powder cocaine and for those who possess or distribute more than *fifty grams* of crack cocaine. Section 841(b)(1)(B) sets a mandatory mini-mum five year sentence for those who possess or distribute more than *five hundred* grams of powder cocaine and for those who possess or distribute more than *five* grams of crack cocaine. Courts are required to impose these mandatory minimum sentences.

**4.** 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

**5.** 397 F.3d 103 (2d Cir.2005).

**6.** 18 U.S.C. § 3553(a).

of 151 months on Count 1 and a mandatory sixty consecutive months on Count 2, to be followed by a five-year period of supervised release. This Opinion sets forth my reasons for imposing a non-Guidelines sentence.

## II. BACKGROUND

### A. The Offense Conduct

### 1. The Organization

Between 1999 and 2003, two of Fisher's co-defendants, Ricardo Rodriguez and Paul Thompson, were the leaders of an organization known as the Killer Bronx Committee or KBC, which distributed crack cocaine in the Bronx [7] and Vermont.[8] Its members included Fisher, Jason Rose, Junior Robinson, Damion Henry, Tai Todd, Stephen Reid, Kevin Jones, Kevin Brown, Tyrone Kindred, Orlando Gordon and others known and unknown.[9] Fisher, together with others, helped manage the organization's crack-selling operations.[10] The organization controlled the sale of crack cocaine on 228th Street between White Plains Road and Barnes Avenue in the Bronx.[11] Rodriguez and Thompson distributed crack cocaine to their sellers, including Fisher, Henry, Jones, and Reid, who then distributed it to the customers.[12] From January 2001 onward, KBC's crack cocaine business was very successful.[13] Members of the organization were selling large amounts of crack cocaine each day, and customers were constantly streaming into the organization's stash houses.[14] The organization branched out into Vermont in April 2003.[15]

Rock testified that she met Fisher in April 2003 in Winooski, Vermont.[16] Fisher and Rock began dating and Fisher soon moved into Rock's house.[17] Shortly thereafter, Fisher began bringing other KBC members to Rock's house for the purpose of selling crack cocaine.[18] Fisher and Rodriguez cooked crack cocaine inside Rock's house and, along with Robinson, packaged it there.[19] All of the members carried firearms while in Rock's house.[20] Rock testified that during the three to four month period that the organization sold crack cocaine from her home, she observed

---

**7.** From as early as 1999, the organization maintained a stash house in an abandoned building at 714 East 228th Street, where it cooked and packaged crack cocaine and stored guns. *See* Trial Transcript ("Tr.") at 1138–39, 1669–70. The organization also maintained a stash house in an apartment at 720 East 228th Street. *See id.* at 1686. In addition, the organization maintained another stash house on East 228th Street, in an apartment belonging to a woman referred to as "Ma," who was given crack cocaine in exchange for allowing the organization to store and sell crack cocaine from her apartment. *See id.* at 1154–55. While in Vermont, the group maintained its crack cocaine supply in the home of Tanya Rock, a cooperating witness. *See id.* at 2190–91, 2193–94, 2215–16, 2486–87.

**8.** *See* Presentence Report ("PSR") ¶¶ 17, 18, 21.

**9.** *See id.* ¶ 23.

**10.** *See id.*

**11.** *See id.* ¶ 21.

**12.** *See id.* ¶ 27.

**13.** *See* Tr. at 1053–56, 1676, 1690–92.

**14.** *See id.* at 1053–54, 1676.

**15.** *See id.* at 2188–89, 2314–15, 2500–02.

**16.** *See id.* at 2183, 2400–01, 2466.

**17.** *See id.* at 2163, 2186–88, 2326–27, 2466–68.

**18.** *See id.* at 2188–89, 2314–15, 2500–02.

**19.** *See id.* at 2190–91, 2193–94, 2215–16, 2486–87.

**20.** *See id.* at 2191–95.

sales around the clock.[21] Beginning in October 2003, members of KBC ran their business from another location in Winooski, Vermont.[22] After several police officers raided Rock's house and arrested her, she did not see any KBC member again until trial.[23] In December 2003, the group returned to East 228th Street to resume selling drugs in the Bronx.[24] Detectives from the Bronx Gang Squad arrested KBC members over a two-day period beginning on January 26, 2004.[25]

### 2. Drug Quantity

■ Cooperator testimony, from Kindred, Gordon and Rock, established that Fisher was a fully active and knowing participant in the group led by Rodriguez and Thompson. Fisher joined the group in 2001, after it took control of the crack cocaine trade on East 228th Street and White Plains Road. Specifically, Kindred testified that he observed Fisher obtain crack cocaine from Rodriguez and Thompson.[26] Kindred also testified that Fisher sold crack cocaine daily on the street, served as a lookout, and packaged crack cocaine in the group's stash houses.[27] Kindred further testified that Rodriguez and Thompson gave Fisher packages containing $130 or $260 worth of crack cocaine every day for months at a time.[28] Gordon similarly testified that he observed Fisher and his co-defendants sell over $260 worth of crack cocaine, per day, over a period of months between 2001 and 2002.[29] The testimony of Kindred and Gordon established that it was readily foreseeable to Fisher that he and his co-conspirators sold at least 1.5 kilograms of crack cocaine during the two year period that Fisher was a member.

The testimony and evidence concerning the Vermont portion of the conspiracy only served to reinforce a finding that Fisher was responsible for selling more than 1.5 kilograms of crack cocaine. Rock witnessed Fisher and his co-defendants sell hundreds of pieces of crack cocaine from her home, ranging in value from $50 to $250.[30] Rock testified that 3.5 grams of crack cocaine sold for $250.[31] She testified that crack cocaine sales at her house took place around the clock.[32] Furthermore, Rock's testimony that Fisher was selling crack cocaine in Vermont is strongly corroborated by his arrest for possession of crack cocaine in Winooski, Vermont on October 20, 2003.[33]

■ In sum, the Government has proven, by a preponderance of the evidence, that Fisher is responsible for the distribution of more than 1.5 kilograms of crack cocaine.[34] Where a defendant participates in jointly undertaken criminal activity, he may be sentenced based on the criminal

---

21. *See id.* at 2209.

22. *See id.* at 2214, 2225–27, 2500.

23. *See id.* at 2254, 2367–68.

24. *See id.* at 1172–78.

25. *See id.* at 337.

26. *See id.* at 1056–57, 1134–35, 1151–52.

27. *See id.* at 1057, 1134, 1147.

28. *See id.* at 1130–31, 1153–54.

29. *See id.* at 1664–67, 1680–83.

30. *See id.* at 2209–10.

31. *See id.* at 2210.

32. *See id.* at 2209.

33. *See id.* at 887, 1965–68.

34. *See United States v. Kim,* 193 F.3d 567, 575 (2d Cir.1999) (stating that the Government need only prove facts in support of a sentencing calculation by a preponderance of the evidence).

acts of his co-conspirators so long as the other acts were committed in furtherance of the conspiracy and could reasonably have been foreseen by the defendant.[35] Here, it was reasonably foreseeable that Fisher and his co-conspirators would distribute more than 1.5 kilograms of crack cocaine.

**B. The Guidelines**

█ In light of the Supreme Court's decision in *United States v. Booker*, the Guidelines are now advisory and no longer mandatory.[36] However, the "first step in post-*Booker* sentencing is to determine the applicable Guideline range after making such findings of facts as are necessary" such as drug quantity.[37] A court is required to *consider* this Guidelines range along with the sentencing factors set forth in section 3553(a).

Defendant was convicted of participating in a drug conspiracy in violation of sections 846, 841(a)(1) and 841(b)(1)(A) of Title 21 of the United States Code, which require a statutory minimum term of ten years. He was also convicted of aiding and abetting the use and carrying of firearms in furtherance of a narcotics conspiracy in violation of section 924(c)(1)(A)(i) of Title 18 of the United States Code, which requires a mandatory term of sixty months, consecutive to any other term of imprisonment.[38] Thus, the mandatory minimum term here is fifteen years in custody.

Because I find defendant to be responsible for the possession and distribution of more than 1.5 kilograms of crack cocaine, his base offense level is 38. With respect to criminal history, the Government agrees with Fisher that he falls in Criminal History Category ("CHC") I, not CHC II as calculated by the Probation Department. The PSR assigned Fisher two criminal history points, one for each of two narcotics arrests that occurred on May 10, 2001 and November 18, 2002 in the Bronx. These arrests, however, were for conduct that was part of the offense of conviction. Pursuant to section 4A1.2 of the Guidelines, these convictions are excluded from the calculation of Fisher's criminal history.[39]

Accordingly, Fisher's Guidelines range, based on an offense level of 38 and a CHC of I, is 235–293 months in custody, to be followed by a mandatory consecutive sixty month term, requiring a total Guidelines sentence of 295 to 353 months in custody. Furthermore, there are no grounds here for a downward departure. Defendant's

---

**35.** *See United States v. Jackson*, 335 F.3d 170, 181 (2d Cir.2003) ("Under well-established law, [defendant] was responsible not only for the cocaine that he himself conspired to import but also for the cocaine his co-conspirators conspired to import, provided he knew of his co-conspirator's illicit activities or the activities were reasonably foreseeable by him.").

**36.** *See Booker*, 125 S.Ct. at 764 (declaring the mandatory nature of the Guidelines to be unconstitutional but creating a remedy that "requires judges to take account of the Guidelines together with other sentencing goals").

**37.** *Simon v. United States*, 361 F.Supp.2d 35, 39 (E.D.N.Y.2005) (citing *Crosby*, 397 F.3d at 112).

**38.** Section 2K2.4 of the Guidelines provides that the sentence for a defendant convicted of violating section 924(c) of Title 18 of the United States Code is the "minimum term of imprisonment required by statute." Here, the minimum term of imprisonment is sixty months under 18 U.S.C. § 924(c)(1)(A) because the firearm was neither brandished (seven years) nor discharged (ten years).

**39.** "The term 'prior sentence' means any sentence previously imposed upon adjudication of guilt, whether by guilty plea, trial, or plea of *nolo contendere*, for conduct not part of the instant offense." U.S.S.G. § 4A1.2(a)(1).

youth is not a ground, nor is his family background or his role in the offense.

It is important to note that 1.5 kilograms of powder cocaine, as opposed to crack cocaine, would have required a base offense level of 26, resulting in a Guidelines range at CHC I of 63–78 months in custody. The difference between 63 and 235 months, the lowest end of the respective Guidelines ranges, is *over fourteen years*. This enormous difference makes little sense for the reasons set forth below.

## III. DISCUSSION

### A. The 100:1 Ratio

Although the 100:1 ratio has been sharply criticized by judges, scholars, and the Sentencing Commission itself, there was nothing to be done about it in the pre-*Booker* world.[40] "Since *Booker*, a number of courts, concerned by the disparity between crack cocaine and powder cocaine sentences imposed under the Guidelines, have imposed non-Guidelines sentences in cases involving crack cocaine."[41] As Judge Lynn Adelman recognized in *United States v. Smith*, "[c]ourts, commentators and the Sentencing Commission have long criticized this disparity, which lacks per-

suasive penological or scientific justification, and creates a racially disparate impact in federal sentencing."[42]

Punishing crack cocaine dealers one hundred times more severely than powder cocaine dealers leads to the following results: (1) it unfairly targets low-level street sellers over major suppliers, (2) it has a disparate impact on black defendants over white and Hispanic defendants; (3) it has a disparate impact on younger offenders over older ones; and (4) it turns on the fortuity of whether the offender has cooked the powder into crack cocaine at the time of the arrest.[43] Furthermore, there is no rational basis in terms of pharmacological differences,[44] public opinion, or related violence to distinguish crack cocaine from powder cocaine at a ratio of one being one hundred times worse than the other.[45]

In studying recent sentencing statistics I have noted other surprising disparities: In the latest statistics released by the U.S. Sentencing Commission, crack cocaine offenders subject to mandatory minimum sentences received safety valve treatment less often that any other category of drug offenders.[46] Crack cocaine

---

40. *See United States v. Moore*, 54 F.3d 92, 97–99 (2d Cir.1995) (refusing to invalidate the 100:1 ratio because there was "no evidence of a racially discriminatory purpose behind the ratio").

41. *United States v. Castillo*, No. 03 CR 835, 2005 WL 1214280, at *5 (S.D.N.Y. May 20, 2005) (Sweet, J.). *See also United States v. Clay*, No. 2:03 CR 73, 2005 WL 1076243, at *5 (E.D.Tenn. May 6, 2005) ("Since *Booker*, a number of courts have accepted the argument that in cases involving crack, they should consider non-Guidelines sentences.").

42. 359 F.Supp.2d 771, 777 (E.D.Wis.2005). *Accord United States v. Beamon*, 373 F.Supp.2d 878 (E.D.Wis.2005); *United States v. Leroy*, 373 F.Supp.2d 887 (E.D.Wis.2005).

43. *See Beamon*, 373 F.Supp.2d 878.

44. It should be noted that crack cocaine is not a purified form of cocaine as it contains many of the cutting agents and impurities present in the cocaine hydrochloride from which it is made. For example, in 2003, the National Drug Intelligence Center reported that the average purity of a kilogram of powder cocaine in Bridgeport, Connecticut was 85%, while the purity of crack cocaine ranged from 35–90%. *See Connecticut Drug Threat Assessment Update*, Table 4 (July 2003).

45. *See Smith*, 359 F.Supp.2d at 777–80; *Castillo*, 2005 WL 1214280, at *5.

46. The safety valve is found at section 3553(f) of Title 18 of the United States Code, which provides that under certain circumstances a defendant need not be sentenced to the statutory minimum.

offenders received the safety valve only 12% of the time, whereas powder cocaine offenders received it 36% of the time, and heroin offenders 35% of the time.[47] The safety valve device is weighted against street level dealers, who often have several prior convictions for distributing small amounts of drugs to undercover agents in routine buy and bust cases. The same statistics showed that 76% of all crack cocaine offenders received a mandatory minimum sentence in 2003, and 48% of those offenders received the ten-year mandatory minimum term.[48] Finally, the average sentence for those who distribute powder cocaine is 81 months, as compared to 123 months for those who distribute crack cocaine.[49]

The figures for the race of defendants by drug type are striking. Eighty percent of those sentenced for crack cocaine distribution are black, while only 25% of those sentenced for powder cocaine distribution are black.[50] The figures are entirely reversed for Hispanics—only 10% of crack offenders are Hispanic while 56% of pow-

der cocaine offenders are Hispanic.[51] The total minority percentage of defendants convicted of crack cocaine offenses is 92%, powder cocaine 83%, and heroin 87%.[52] Moreover, 50% percent of all drug offenders are thirty and under.[53] By contrast, 27% of those who are convicted of fraud offenses are thirty and under.[54] Thus, the heavy crack cocaine sentences called for by the Guidelines are disproportionately imposed on young black males.[55]

This 100:1 ratio has been repeatedly criticized by the Sentencing Commission, at one time by the Executive Branch, and by many courts, including two judges in this district and one judge of the Second Circuit. A brief summary of its history is in order. Although Congress adopted the 100:1 ratio in setting minimum sentences, the Sentencing Commission was not required to adopt the 100:1 ratio in the Guidelines.[56] In 1987, however, the Sentencing Commission adopted the 100:1 ratio in developing the Guidelines for cocaine offenses.[57] The 100:1 ratio came under heavy criticism from the start and, in 1994,

47. *See* 2003 Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, Table 44, *available at* http://www.ussc.gov/ANNRPT/2003/SBTOC03.htm.

48. *See id.* at Table 43, *available at* http://www.ussc.gov/ANNRPT/2003/table43.pdf.

49. *See id.* at Figure J, *available at* http://www.ussc.gov/ANNRPT/2003/fig-j.pdf.

50. *See id.* at Table 34, *available at* http://www.ussc.gov/ANNRPT/2003/table34.pdf.

51. *See id.*

52. *See id.*

53. *See* 2003 Sourcebook of Federal Sentencing Statistics, United States Sentencing Commission, Table 44, *available at* http://www.ussc.gov/ANNRPT/2003/table6.pdf.

54. *See id.*

55. I use the word "male" deliberately, as 87% of all defendants are men. *See id.* at Table 5, *available at* http://www.ussc.gov/ANNRPT/2003/table5.pdf.

56. *See United States v. Gaines*, 122 F.3d 324, 326 n. 4 (6th Cir.1997) ("In 28 U.S.C. § 994, Congress granted to the Sentencing Commission broad discretion to establish the Sentencing Guidelines, including the ratio of its choosing....").

57. *See* Federal Sentencing Guideline Manual (1987 edition) (effective November 1, 1987). The fact that the Commission deferred to Congress when establishing the ratios is made evident by the following admission in the first Federal Sentencing Guideline Manual (1987 edition): "Note: Because of the *statutory equivalences,* the ratios in the Drug Equivalency Tables do not necessarily reflect dosages based on pharmacological equivalents." Application Note 10 to U.S.S.G. § 2D1.1 (emphasis added).

Congress directed the Sentencing Commission to study and report on federal sentencing policy relating to all forms of cocaine.[58] The result was the *Special Report to the Congress: Cocaine and Federal Sentencing Policy* (the *"Cocaine Report"*), which was issued in February 1995. "In the *Cocaine Report*, the Sentencing Commission concluded that it could not support the penalty scheme in force." [59] On May 1, 1995, based on the *Cocaine Report*, the Sentencing Commission proposed to Congress several amendments to the Guidelines,[60] one of which recommended adopting a 1:1 equivalence between crack and powder cocaine.[61] Despite what has been described as an "extraordinary mea culpa" by the Sentencing Commission,[62] Congress rejected the Sentencing Commission's proposed amendments.[63]

Two years later, in response to a 1995 Congressional directive, the Sentencing Commission submitted a second report to Congress entitled *Special Report to Congress: Cocaine and Federal Sentencing Policy* (the *"1997 Commission Report"*).[64] Congress took no action on the *1997 Commission Report*, which proposed a range of alternatives for ameliorating the penalty differential for powder cocaine and crack cocaine [65] "On July 22, 1997, the Clinton Administration publicly proposed reducing the ratio to 10:1." [66] However, no bill was ever introduced to reduce the ratio.[67] In 1998, twenty-seven federal judges wrote to the chairmen of the House and Senate judiciary committees to express their "strongly held view that the current disparity between powder cocaine and crack cocaine, in both the mandatory minimum statutes and the guidelines, can not be justified and results in sentences that are unjust and do not serve society's interest." [68] Finally, in 2002, the Commission issued another report which did not propose Guidelines amendments, but effectively recommended reducing crack cocaine sentences to reflect a 20:1 ratio with powder cocaine.[69] Again, Congress took no action.

**58.** *See Gaines,* 122 F.3d at 326.

**59.** *Id.* "It is significant that all seven members of the Sentencing Commission agreed that the 100–to–1 ratio was not justified and that, therefore, the ratio should be reduced dramatically." *United States v. Petersen,* 143 F.Supp.2d 569, 577 (E.D.Va.2001).

**60.** Amendments to the Sentencing Guidelines, Policy Statements and Official Commentary, 60 Fed.Reg. 25074, 25074 (May 1, 1995).

**61.** *See Simon,* 361 F.Supp.2d at 45.

**62.** *Gaines,* 122 F.3d at 336 (Jones, J., dissenting) (" 'But this case is *sui generis* in the history of the guidelines. Here, the Commission itself has acknowledged that its crack guidelines bear no meaningful relationship to the culpability of defendants sentenced pursuant to them.' ") (quoting *United States v. Anderson,* 82 F.3d 436, 449–50 (D.C.Cir.1996) (Wald, J., dissenting)).

**63.** *See* Pub.L. No. 104–38, 109 Stat. 334 (October 30, 1995). This was one of only two

times that amendments proposed by the Commission were rejected by Congress. The second time was in connection with amendments related to money laundering, which were submitted together with the proposed reduction in the crack/powder cocaine ratio. To date, there have been 674 amendments to the Guidelines.

**64.** *See Petersen,* 143 F.Supp.2d at 578.

**65.** *See United States v. Perry,* C.R. No. 04–089S, 2005 WL 2260196 (D.R.I.2005).

**66.** *Simon,* 361 F.Supp.2d at 45.

**67.** *See id.*

**68.** Judge John S. Martin et al., *1997 Statement on Powder and Crack Cocaine to the Senate and House Judiciary Committees,* 10 Fed. Sent. R. 194 (1998).

**69.** *See id.* at 46.

Given the range in ratios proposed in the past, I conclude that a 10:1 ratio is sufficient to punish crack cocaine dealers more harshly than those who deal in powder cocaine. Using a 10:1 ratio, the 1.5 kilograms of crack cocaine for which defendant is responsible converts to fifteen kilograms of powder cocaine, which corresponds to offense level 34. At offense level 34, CHC I, defendant's Guidelines range is 151 to 188 months in custody. Because 1.5 kilograms of powder cocaine would have resulted in a sentence of 63–78 months in custody, this ten-fold disparity between crack and powder cocaine results in a seven-year difference in the sentencing range at the low ends. This is more reasonable than the fourteen-year disparity resulting from the 100:1 ratio. I also note that using a 10:1 ratio still places Fisher well above the statutory mandatory minimum of ten years required by Congress based on the possession of more than fifty grams of crack cocaine.

The Government argues in favor of the 100:1 ratio, noting that Congress had a rational basis for punishing crack cocaine dealers more harshly than powder cocaine dealers and did not act with any improper race-based motivation. In addition, the Government argues that judges will create unwarranted sentencing disparities if they ignore the Guidelines ratio and instead create their own ratios. This will lead to variations in sentences based on each judge's view of the relative harm caused by each drug.

A similar point of view is found in *United States v. Tabor*.[70] There, the court found that it was the will of Congress that crack cocaine dealers be punished one hundred times more harshly than those who deal in powder cocaine.[71] "[T]he crack cocaine Guidelines represent a reasoned and reasonable policy choice by Congress that should be given substantial deference." [72]

In summary, Congress has made a choice regarding crack cocaine. To my way of thinking, it is not the best choice, but it is not a crazy one either. As a judge, I should defer to the choice of penalties that Congress has made for crack cocaine even though I would quickly do something different if it were within my proper role to choose. This is because judge-made changes to the crack Guidelines, while sometimes principled, are (1) undemocratic, and (2) not plainly superior to the judgments of Congress. We should maintain the status quo when exercising our *Booker* discretion within the context of the crack cocaine Guidelines because we are judges and not legislators and because the status quo is what Congress has chosen. When it comes to the severity of punishment, Congress has the right to be wrong.[73]

Congress implemented its decision to punish crack cocaine dealers more severely than powder cocaine dealers by imposing the same mandatory minimum terms for much smaller quantities of crack than powder cocaine. I recognize that the will of Congress must be obeyed. Accordingly, this Court would not and has not ignored Congress and imposed a sentence below the required statutory mandatory minimum term. However, the argument that

---

70. 365 F.Supp.2d 1052 (D.Neb.2005).

71. *See id.* at 1058 ("It is for that reason—Congress' evident desire to protect those who are least able to protect themselves—that a judge ought not play legislator and should

instead give the crack Guidelines substantial or heavy weight after *Booker*.").

72. *Id.* at 1054.

73. *Id.* at 1060 (footnote omitted).

courts must adhere to the 100:1 ratio in setting offense levels *under the Guidelines* suffers from a single, fatal flaw. Both the Government and the *Tabor* court have failed to recognize that the Guidelines are not an act of Congress. Furthermore, they are no longer mandatory according to the Supreme Court's decision in *Booker.*

Given that the Guidelines are not an act of Congress, it does not subvert the will of Congress for a court to impose a non-Guidelines sentence if it concludes, after considering the individualized factors required by section 3553(a), that the Guidelines range creates unwarranted sentencing disparities. This is the teaching of *Booker.* If the Government's argument was correct, the 100:1 ratio found in the Guidelines would be binding and *Booker* would be a nullity.[74] It is the duty of each court to determine a reasonable sentence based on a consideration of all of the statutory factors. Thus, while the 100:1 ratio set by Congress in establishing statutory minimum sentences under section 841 must be respected by sentencing courts, the 100:1 ratio need not be followed in imposing sentences.

### B. The Section 3553 Factors

Section 3553(a) sets forth the following factors that must be considered by a sentencing court in imposing every sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for—

(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ...

(5) any pertinent policy statement ...

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.[75]

Based on most of these factors,[76] I conclude that a sentence of 211 months in custody is sufficient, but not greater than necessary, to serve the required purposes of sentencing. Furthermore, I find that the 100:1 ratio creates unwarranted sentencing disparities and, in so doing, violates sections 3553(a)(2)(A) and (a)(6).

---

74. *Cf. Perry,* at 308 n. 33 ("[I]f Congress' rejection of the 1995 amendment was considered binding on courts with respect to whether the crack guidelines must be applied it would lead to the same constitutional problem that plagued the Guidelines as a whole.").

75. 18 U.S.C. § 3553(a).

76. There is no Policy Statement addressing the disparity between crack and powder cocaine or, for that matter, the sentencing of cocaine offenses in general. Therefore, section 3553(a)(5) is not applicable. Nor is section 3553(a)(7), as this case does not involve restitution.

### 1. Section 3553(a)(1): Offense Characteristics

This offense involved a crack cocaine distribution conspiracy based in the Bronx that used guns in furtherance of its criminal activities. Participation in such a conspiracy is, of course, a very serious crime and deserves a significant period of incarceration. Other members of this conspiracy are facing many years in custody with sentences as high as forty years, although some members have received sentences as low as five years.

### 2. Section 3553(a)(1): Offender Characteristics

Fisher, a black male, was born in Jamaica on August 5, 1981, and is twenty-three years old. Fisher and his mother lawfully immigrated to the United States in 1991, although he returned to Jamaica to attend high school. In 1998, Fisher graduated from the Arden High School in Kingston, Jamaica. Shortly thereafter, he returned to the United States. Fisher has been smoking marijuana since he was seventeen years old, but he does not drink alcohol. Fisher has a spotty and unverified employment history, having worked at a number of low-level jobs from 2000 to 2003, all of which were short-lived and "off the books." While he has two prior convictions that involved conduct that was part of this conspiracy, he has served only a few months in jail.

### 3. Section 3553(a)(2): The Need for the Sentence Imposed

■ Section 3553(a)(2)(A) requires a sentencing court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment. A sentence of the length imposed is sufficient to meet all of these goals. A sentencing court must impose a sentence "sufficient, but not greater than necessary" to comply with the purposes of sentencing.[77] Here, the Guidelines range is based largely on the crack/powder cocaine disparity. A sentence within this range is greater than necessary to satisfy the purposes of sentencing. Fisher's sentence complies with section 3553(a) without imposing an unnecessarily harsh sentence on the defendant, or a burden on society to pay for an unduly lengthy period of incarceration. "A 'just punishment' must ... take into account the cost of the defendant's criminal conduct and the cost society must undertake to punish for the offense."[78]

With regard to section 3553(a)(2)(B), which requires adequate deterrence, Congress has concluded that crack-related offenses are to be punished more severely than offenses involving powder cocaine. To achieve general deterrence, therefore, Fisher's sentence must be significantly greater than what he would have received if he had dealt powder cocaine. A sentence of 151 months on the drug count is more than seven years longer than the sentence he would have received at the low end of the range if he had distributed powder cocaine. Such an enhanced sentence surely provides substantial deterrence to this defendant and to others who consider dealing in crack cocaine.

Section 3553(a)(2)(C) requires the Court to consider the need to protect the public from future crimes by this defendant. Defendant will be over forty years old when he is released from custody. By that time, he should have obtained some education and learned a trade so that he can become

---

77. 18 U.S.C. § 3553(a).

78. *Simon*, 361 F.Supp.2d at 43 (quoting *United States v. Zakhor*, 58 F.3d 464, 466 (9th Cir.1995)).

a productive member of society upon release. And hopefully he will have renounced the drug trade forever. Although no one can predict the future, a sentence of 211 months sufficiently protects the public from any further crimes.

Finally, with regard to section 3553(a)(2)(D), a sentence of this length will provide Fisher with educational and vocational training opportunities while in custody. Whether he takes advantage of these opportunities is his choice, but he will have the time to do so given the length of his sentence.

### 4. Sections 3553(a)(3) and (a)(4): The Kinds of Sentences Available and the Sentencing Range

Jail is required here and the only issue is the length of imprisonment. The Guidelines call for a sentence at the low end of 235 months in custody. This Guideline is driven solely by the amount of crack cocaine distributed by this defendant and his co-conspirators. As noted earlier, a similar weight of powder cocaine would have placed this defendant at offense level 26, which corresponds to a sentence of 63 to 78 months in custody. A difference of fourteen years at the low end of the Guidelines range, based simply on the different forms of the same drug, is unreasonable and cannot be countenanced by this Court.

### 5. Section 3553(a)(6): The Need to Avoid Sentencing Disparity

Avoiding sentencing disparity is particularly important when a court imposes a non-Guidelines sentence. The sentence called for by the Guidelines, based solely on the quantity of crack cocaine, creates an unwarranted disparity between powder cocaine and crack cocaine dealers. The Government argues that if courts do not use the 100:1 ratio, there will be unwarranted sentencing disparities. The prob-

lem is that the crack/powder cocaine ratio *currently* results in unwarranted disparities. To address this problem, courts must look at each offense and offender and decide on a reasonable sentence. This will inevitably lead to disparities in sentences but they will not be unwarranted. They will be based on reason, experience and common sense.

## IV. CONCLUSION

The recommended Guidelines range for the drug count, 235 to 293 months in custody, substantially overstates the seriousness of the offense, especially when compared to the Guidelines range for an offense involving a comparable quantity of powder cocaine. To impose a sentence based on this inflated range creates unwarranted sentencing disparity. It is incumbent on sentencing courts to reduce such disparity whenever possible.

Imposing a non-Guidelines sentence does not flout the will of Congress. This Court has accepted that it is the will of Congress to distinguish between those who deal in crack cocaine and those who deal in powder cocaine. I respect that and have applied a different (and much enhanced) measure in sentencing this defendant for dealing in crack cocaine.

Based on all of the factors set forth in section 3553(a), Otis Fisher is sentenced to 151 months on Count One, to be followed by a mandatory consecutive term of five years, for a total of 211 months (approximately 17½ years) in custody to be followed by five years of supervised release.

SO ORDERED.